Peck, P. J.
Plaintiff secured a jury verdict against the City of New York for. injuries sustained when he slipped on snow and ice on the sidewalk abutting a vacant lot on St. Marks Place between 2nd and 3rd Avenues in the borough of Manhattan. The accident occurred at 2:30 p.m. on Monday, December 29,1947, sixty hours after the termination of the record-breaking snowstorm of December 26-27, 1947, when 25.8 inches of snow fell, accompanied by precipitation of 2.67 inches. The temperature was below freezing during the storm and for nearly all the period thereafter up to the time of the accident, and for a considerable part of the time there was high wind. The records of the weather bureau show that the snowfall was the greatest for any twenty-four-hour period in the history of the bureau, exceeding even the blizzard of ’88.
The question we are called upon to decide is whether the failure of the city to remove the snow and ice from the sidewalk within sixty hours under the conditions present warranted a jury finding of negligence. If the evidence left a jury question, we should affirm; if the evidence left no basis for a finding of negligence, we must reverse and dismiss the complaint. While the unprecedented snowfall is the most significant factor in the case and one distinguishing it from all other snow and ice cases, we look beyond that fact to all the evidence bearing on conditions existing at the time and the efforts of the city to clear the snow and ice from the streets and sidewalks.
The record shows that over 10,000 regular department of sanitation employees were engaged in the task of snow removal during the twenty-four hours of the storm and each twenty-four hours thereafter up to the time of the accident; that there were 9.000 additional employees on the 27th, 14,000 on the 28th and 23.000 on the 29th. Over 2,500 pieces of department equipment were used each day and over 1,200 pieces of additional equipment on December 28th and 29th. The extra personnel and equipment were so promptly engaged as a result of registering them earlier in the season. The commitment of all available equipment to the task is evidenced by the fact that the collec *409 tion of ashes, garbage and rubbish was suspended for a week following the storm, because all collection trucks were equipped with plows and assigned to plowing.
The immensity of the snow removal task is indicated by the fact that there are 5,710 miles of roadway and 11,420 miles of sidewalk in the city of New York. While it is the objective and duty of the city to clean both streets and sidewalks as soon as reasonably possible, the work obviously cannot proceed at a pace at all places at the same time, and there is a necessary rationing of the working force and certain priorities. Ahead of sidewalks come the roadways, which must be cleared as immediately as possible for the emergency traffic of police, fire apparatus and ambulances and for essential traffic engaged in the distribution of foodstuffs and other necessities of life. Also ahead of sidewalks is the removal of snow from various terminals in the city and market areas where food and fuel are delivered and disbursed. Then within the sidewalk areas there is a proper priority in favor of business and shopping sections, where there is heavy congestion of pedestrian traffic.
The record reveals that in addition to the unprecedented volume of snow to be removed there were unusual impediments. The rate of the snowfall, which at times exceeded three and one-half inches an hour, made the work more difficult, and parked and stalled cars, which had to be abandoned even in the middle of roadways, impeded plows and removal equipment.
Plaintiff does not attempt to belittle the task facing the city at this time, indeed concedes that even if the city had at its command a force of men and pieces of equipment twice the size shown in the record the task of removing snow from sidewalks as well as roadways would be impossible. Bather, plaintiff points to the statutory assistance which the city enjoys to compel abutting landowners to remove the snow in front of their properties, and plaintiff’s position in this case seems to come down to the contention that there was a question of fact presented as to whether the city failed to utilize its statutory powers.
As to the city’s effort to get the landowners to perform their duty in the vicinity of the accident, the police officer on the beat on December 29th, testified that he had on that Monday morning directed all the storekeepers and property owners whom he could contact to clear the snow from the sidewalks in front of their premises, and repeated the warnings during the day, and that by 2:30 p.m., when plaintiff fell, less than half the sidewalks were cleaned. He also testified that both before and after plaintiff’s fall he tried to locate the owner of the vacant lot for the purpose *410 of notifying him to clean the sidewalk, but at the address he was given he was told that the owner was not at home.
diving dne weight to the statutory authority which the city has in the matter of snow removal, which is to require property owners to remove snow from their sidewalk frontage within four hours after the termination of a snowfall or suffer the expense of such removal by the city, it is apparent that procuring removal by this means requires time and personnel in getting after landowners and either forcing them to do the work or substituting for them.
Over all we are unable to see that plaintiff made out any case of negligence justifying submitting the case to the jury. Considering the volume and rate of the snowfall and the accompanying conditions, creating a problem of snow removal beyond any experience or expectation and straining all the facilities of the city for the purpose, it would not be reasonable to expect the city to have the sidewalks clear in front of every vacant lot within sixty hours.
Plaintiff relies on the case of Hofmann v. City of of New York (297 N. Y. 735) where a verdict in favor of the plaintiff was sustained. There was a snowfall of ten inches and the plaintiff fell on the sidewalk in front of a vacant store.about fifty-seven hours after the storm. A weather expert testified that a snowfall of ten inches was quite usual in the city. The city produced evidence that its employees had been engaged in continuous efforts to remove the snow and that labor was hard to procure because of the war. A police officer testified that prior to the accident he had toured the area where plaintiff fell but had not notified anyone to clear the sidewalks.
While the Hofmann case (supra) is one of the most recent in the rather long line of snow and ice cases, it must be considered in connection with others, such as Reutlinger v. City of New York (281 N. Y. 592) and Kirsch v. City of New York (289 N. Y. 684) where judgments in favor of plaintiffs were reversed and the complaints dismissed. The accidents in those cases occurred eight days and five days, respectively, after a snowfall of seventeen and one-half inches. We think that the present case is an a fortiori case from the Reutlinger and Kirsch cases.
There is no formula for determining liability on the basis of any ratio between the number of inches of snowfall and the time elapsed before the happening of the accident and, ordinarily, we would agree with plaintiff that these factors, as well as all the other conditions, constitute a jury question. But as the decisions show, not every case under all circumstances makes a *411 jury risk. The combination of facts in a particular case may be such that it falls beyond the realm of a jury risk. We think this is such a case. We hold as a matter of law that sixty hours was not sufficient time under the circumstances to impose upon the city a citywide burden of sidewalk snow clearance.
The judgment should be reversed, with costs to the appellant and the complaint dismissed, with costs.
Glennon, Dore, Cohn and Callahan, JJ., concur.
Judgment unanimously reversed, with costs to the appellant and the complaint dismissed, with costs.